### SAMUEL M. LANGSTON CO. v. CAMERON MACH. CO.

(District Court, E. D. New York. August 23, 1922.)

1. Patents ⬳328—1,174,738, for slitter and rewinder, held valid and infringed.
   The Langston patent, No. 1,174,738, for a slitter and rewinder, with mechanism for slitting the material and guiding it to the rewinding mechanism, *held* valid and infringed.

2. Patents ⬳317—When plaintiff entitled to injunction stated.
   Plaintiff, suing for patent infringement, is entitled to injunctive relief whenever further infringement is threatened. or the probability of infringement is shown; but where a different type of machine is now being used, and it is reasonably certain that no infringement has been intended for a long time, or is now contemplated, an injunction will be denied.

In Equity. Suit by the Samuel M. Langston Company against the Cameron Machine Company. Decree for plaintiff.

Irving M. Obrieght, of New York City (Clair W. Fairbank, of New York City, of counsel), for plaintiff.

Axel V. Beeken, of New York City, for defendant.

CHATFIELD, District Judge. This suit is brought by the plaintiff, as grantee of United States patent No. 1,174,738, dated March

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7, 1916, on an application filed July 24, 1913, by Samuel M. Langston, the president of the corporation. The patent states that it relates to "mechanism for slitting the material and guiding it to the rewinding mechanism" in machines known as slitters and rewinders, by which sheet material, such as paper, is delivered from a roll, slitted into separate, continuous strips by rotary cutters, and rewound in separate, narrower rolls.

The Langston machine, described in the patent, uses as cutters a number of sharp rotatable steel disks, resiliently pressed against the material to be cut, as the latter passes over the polished surface of a hardened steel roller, which is entirely separate from the winding mechanism. The prior art, in certain cases, employed a roller (rotating to drive or pull the paper and aiding in the support of the roll upon which the material was to be rewound) as a surface against which the cutter was pressed, and over which the material to be cut passed as it went to the rewinder.

Many machines of the prior art used what is known as a shear cut, in which the cutting edges or cutting disks slightly pass by each other, and thus penetrate through and slightly distort the edge of the material as the cut is made. The machines of the prior art of the shear type are shown in patents which have been put in evidence, as follows: Jefferis, No. 674,919, of May 28, 1901, which used a bowed spreader across the machine; White, 817,025, of April 3, 1906, with guides for the edge of the rolls; White, 1,063,093, of May 27, 1913, with a slip mechanism to relieve strain; and Langston, 1,009,756, of November 28, 1911, with a plurality of fingers to prevent side slip.

In order to get away from the shearing type of cutter, and to cut against the hardened roller above referred to, a change was made to what is known as a score cut. By this method the rotating cutter presses against a platen roller, causing an abrasion or tearing away of the particles of the material, to an extent sufficient to either effect or to make easy the physical separation of the two sides of the cut, even though the cutting member does not penetrate through the material. Machines of this type in the prior art are shown in the following patents: Meisel, 492,964, of March 7, 1893; Stork, 1,040,-587, of October 8, 1912; Cameron and Birch, 1,076,189, of October 12, 1913; Schultz, 1,026,283, of May 14, 1912; Schultze, 1,109,184, of September 1, 1914; and Bosshard, 867,944, of October 15, 1907. (The last three are for cloth or bandage material, and are not entirely analogous.)

As the size of the material to be cut and rewound, such as rolls of paper, increased difficulty was presented in physically sustaining the weight of the large rolls upon a hardened roller of comparatively small axis, without distortion or bending. As the size of the roller increased, mechanical difficulties also entered into the construction of the machine, and the price of the hard roller became prohibitive. Langston met this difficulty by interposing his cutter and the hard roller, against which the cutter was resiliently pressed, at a point intermediate between the roller delivering the paper and the roller over which the paper passed to the rewinder. This was an old feature

of the shear cut machines, and also of Schultz, if Schultz be considered in an analogous art.

It should be observed that the rollers supporting the rewinding roll furnish or share in the driving power of the rewinding roll, and at the same time draw or assist in drawing the paper from the supply roller and over the hard roller against which the cut is made. It is obvious, as well as plainly shown from the prior art, that inequalities in the paper, differences in weight, and uneven or rough edges, cause the separated parts of the strip to overlap or wind up with each other, or to carry into the roll, as rewound, tangled shreds and particles not entirely or cleanly severed from the score cut. This results in tearing, wrinkling, or distortion of the material, or the inclusion of waste in the roll.

The cut itself may be completed, and entire severance of the two sides tested, by using a pin or blade, which will run in the cut after it leaves the abrading or scoring wheel. This pin insures the severance of the two portions, but has no effect in moving bodily either portion from side to side, and in fact, as stated by the witnesses, if the pin were of such size, or pressed against the edge of the paper sufficiently to have any effect upon its position, the edge of the paper would be turned over or injured.

The defendant company is the outgrowth of a firm which had been conducted by Mr. Cameron's father for a number of years, and which gradually built up a separate business in the making of intricate machines, under the guidance of Mr. Cameron, who became interested and showed aptitude for that work. There have been placed in the record a number of patents to Cameron relating to the rewinding or slitting art, as follows: No. 1,076,189, of October 2, 1913; No. 1,116,795, of November 10, 1914; No. 1,148,146, of July 27, 1915; and later patents No. 1,259,834, of March 19, 1918; No. 1,314,786, of September 2, 1919; No. 1,326,644, of December 30, 1919; No. 1,350,064, of August 17, 1920; No. 1,354,673, of October 5, 1920; and No. 1,354,464, of October 5, 1920.

There have also been introduced patents to Holbrook, 828,653, and to Warren, 978,967, showing winders without slitters, which do not affect this issue, but explain the growth of the art. Then we have also cutters running in a groove, and thus resembling the shear cutters, such as Brissaut, 375,728, of January 3, 1868, and Jagenberg (German), 128,708, of June 1, 1901.

Most of the Cameron patents show a scoring or abrading cut, until the grooved roller was adopted, and in general Mr. Cameron has worked until lately along the line of using a score cutter and furnishing means to entirely separate the abraded edges, while Langston was working upon machines which, because of the size of the material upon which they were to be used, employed more readily the shear cut. Since this litigation, however, the groove form of shear cutter has been found to be best for all purposes, and the patent in suit is no longer of consequence.

[1] Examination of the various patents emphasizes the narrow scope of any new combination or change in the style of these ma-

chines. The art has developed within a few years. Every machine is intricate, and requires mechanical adaptation to the precise use for which it is intended. Such machines are not mere aggregations, from the very nature of the application of the different parts in connection with the rest of the machine. The result is that every machine employs inventive ability in arranging mechanically the necessary parts (which of themselves are old) in order to meet the desired service. Each machine, therefore, as a combination, is patentable over every other prior machine with which it is not identical. The elements may be old, but the choice of those elements, and the arrangement necessary in order to use them, requires invention beyond mere mechanical skill.

The plaintiff's assignor, Langston, in his patent No. 1,009,756, showed, with reference to a shear cut, the use of a number of so-called flat fingers, which, by pressing upon the paper, physically separated or moved the paper, to overcome the distortion of cutting and to keep the two portions apart after cutting. When the development of the art and the increased size of slitting machines required application of a score cut to the mechanism, Langston took from this prior art a method of accomplishing and completing the score cut, by spreading the sections immediately after the abrading, but without running any pin or knife edge in the cut.

The record shows that a number of old-style machines had been used by various companies, including the New York & Pennsylvania Paper Company, the Nashua Gummed & Coated Paper Company, which had Kidder or Meisel machines, and the New York & Brooklyn Paper Company, which had a Black & Clausen machine. Their workmen had, as occasion required, and as the material they were using varied in thickness or ran unequal in texture, inserted a wad of paper, so as to raise up the surface to the required position where complete severance would be had. In other instances so-called "spreaders," consisting of a crossbar or arm, which was capable of rotation around the main axle, and of adjustment of position, so as to make it longer or shorter as the situation might require, had been attached in such a way that the crossbar of the spreader would ride either directly over the slit, or on one side or the other of the slit, having the effect of ironing or smoothing down the paper, maintaining its pressure with reference to the cutter, and insuring sufficient tension to cause separation at the cut. In another instance a board, with a slightly bowed or beveled front edge, and with various blocks (attached by a winged nut and bolt, or in some instances by mere nailing to the plank, these blocks also having a rounded or beveled front surface), applied to the paper the same ironing or pressing effect as that occasioned by the spreaders just described, and in the same way assisted in the smooth running of the paper and complete severance of the cut. This was like the idea of the Jefferis bow spreader.

The witnesses who used these appliances evidently observed the obvious proposition that, by bearing a little more heavily on one side of the cut or the other, the paper could be veered off or separated

from the slit. But no particular application was made of this feature, and in practically all of the instances the appliances have not been used recently, due to improvement in the texture of the paper, or because the machines did not require the help of these attachments. None of these, therefore, serves entirely or satisfactorily as public use of the principle covered by the Langston patent, even though they are in every instance much more than two years before his application for a patent. They only narrow the scope of the combination.

The defendant continued in the employment of the score cut until on large machines difficulties were encountered. The plaintiff has developed, since the taking out of the patent in suit, large machines, which apparently meet the demands of the trade, and have employed therein the score cut, and also adopted, as above stated, the use of the so-called fingers shown by the previous Langston patent. Now the plaintiff also finds the groove cutters more satisfactory. The defendant, in its patent specifications of its later patents, has described so clearly and in such a complete way the purposes sought to be accomplished by the Langston patent, that they have been put into the record and been used by both sides, as would be the statements of an expert witness on these points.

As has been stated, both the plaintiff and the defendant have now worked out a new method of accomplishing the cut and of guiding the severed portions to the rewinding roll, through the employment of grooves in the hardened roller. It is stated positively by the defense, and apparently without challenge, that they have no intention of using any of the methods complained of by the plaintiff and covered by the Langston patent in suit.

According to the testimony, but three machines were sent out by the defendant before the adoption of the grooves in the hardened roller, in each of which three machines the defendant used a blade or thin metal strip to take the place of the old art pin. These strips, like the pin, were attached to adjustable arms, so that they could be placed in a position where they would travel in the slit and complete the cutting. Immediately behind the plate or pin, and attached to the same arm, was a curved shoe, which undoubtedly, under the rotation or adjustment of the arm carrying these attachments, could be made to press, as heavily as desired, upon both sides of the cut, and to a certain extent (in one machine, at least), by the looseness of adjustment of the parts, could be made to bear more heavily upon one side or the other.

The defendant disclaims any intention, in using these parts, to have them adjusted so as to bear unequally on one side or the other, and entirely disavows any idea of working the severed portions further apart after the cut had been completely made. Accidental or casual use of the old spreaders, or wooden plates, of the prior art, is not sufficient to make invalid the claims of the Langston patent in suit. The citations in the Patent Office and the granting of the patent give presumptive evidence that recognition of the mechanical principles involved, or possible occasional use in such a way of such devices, and even the open disclosure of the figures of the Langston

patent, No. 1,009,756, which was before the Patent Office at the time, were not sufficient to defeat the application. They all show that the Langston patent was valid in the exact combination and arrangement of parts which is shown in his specifications and described in the claims.

The claims of the Langston patent in suit are as follows:

1. A slitter and rewinder having a pair of drums for supporting between them the roll of rewound material and rotating the latter, a roller adjacent one of said drums and over which paper passes to said drum, a plurality of cutters resiliently pressed against said roller for slitting said paper as it passes over said roller, and a plurality of spreaders pressing against the surface of the paper as it passes from said roller to said drums.

2. A slitter and rewinder having a hardened steel roller, a plurality of cutter disks individually resiliently pressed against said roller and rewinding mechanism, including two drums for supporting and rotating the roll of rewound material, one of said drums receiving the material directly from said roller, and a plurality of fingers having flat ends pressing against the surface of said material intermediate of said roller and said drum.

3. A slitter and rewinder having a pair of drums for supporting between them a roll of rewound material and rotating the latter, a slitting mechanism, including a plurality of cutters, spreader mechanism, including a plurality of spreaders, and a supporting rod; each of said spreaders, being adjustable lengthwise of the rod, and also adjustable about its own axis and in the direction of its length.

And so far as this case is concerned these claims are all valid and infringed, if any one of them is infringed by the defendant's structures in question. The testimony shows that further litigation is threatened or has been instituted between the plaintiff and the defendant with respect to the type of machine now used, namely, the score cut, with grooves in the hardened roller; and the defendant charges that Langston's patent describes no practical apparatus, and is what is known as a "paper patent," with no satisfactory proof of its practicability.

But the testimony is persuasive that the Langston machines, for the heavy uses intended, were workable when made according to the patent in suit; that the change to a grooved roller has made the use of this patent unnecessary, but has not affected its validity; and upon the whole case there is no reason to differ from the ruling of the Patent Office in allowing the issuance of the patent. There seems to be, also, no question that the three machines constructed by the defendant, with the curved, smoothing, and pressing surface, which were shipped to and installed by the New England Paper Company, by the River Raisin Company, and by the Eastern Manufacturing Company, did, in the form in which they were installed, infringe the particular combination of the Langston patent. This infringement has long since ceased. Whether or not damages can be proved, or whether the infringement was so temporary and immaterial as to make recovery of damage of no moment, is something that can be determined before a master.

[2] A plaintiff is entitled to injunctive relief whenever further infringement is threatened, or the probability of infringement is shown; but, in view of the pending litigation over the type of machines now used by both the plaintiff and defendant, and in view of the reasonable certainty that no infringement has been intended for a long peri-

od, or is contemplated in the future, and because of the inherent difficulties arising from the use of injunctive relief as advertising in business competition, the prayer of the plaintiff for injunction as to future infringement will be denied, but with the proviso that the plaintiff may apply to the court at the foot of this decree, if at any time injunctive relief becomes necessary.